## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|                            |   |                         |
|----------------------------|---|-------------------------|
| **WILBUR SMITH,**          | ) |                         |
|                            | ) | **PUBLISH**             |
| **Plaintiff,**             | ) |                         |
|                            | ) |                         |
| **v.**                     | ) | **CIVIL ACTION 12-0501-WS-B** |
|                            | ) |                         |
| **SEAPORT MARINE, INC.,** *et al.*, | ) |                  |
|                            | ) |                         |
| **Defendants.**            | ) |                         |

## ORDER

This matter comes before the Court on a trio of Rule 56 motions styled Plaintiff's Motion for Summary Judgment (doc. 46), Seaport Marine Inc.'s Motion for Summary Judgment (doc. 48), and Odyssea Marine Inc.'s Motion for Summary Judgment (doc. 68). These cross-motions, all of which turn on the same narrow question, have been extensively briefed and are now ripe for disposition.

### I.      Nature of the Case.

Plaintiff, Wilbur Smith, initiated this putative class action against defendants, Seaport Marine, Inc. and Odyssea Marine, Inc., predicating subject matter jurisdiction on the general maritime law pursuant to 28 U.S.C. § 1333(1). The case arises from Smith's contractual relationship with Seaport Marine, pursuant to which the latter provided him job placement services in exchange for Smith agreeing to remit a recruitment fee to Seaport Marine in a series of installment payments via an assignment of wages. Seaport Marine successfully found work for Smith with Odyssea Marine, which then honored Smith's assignment of wages. Through that assignment, Seaport Marine received the entire agreed-upon fee of $3,640, and Smith received the balance of his earned wages for each subject paycheck. Smith now brings what he terms a "Seaman's Claim for Wages" under the general maritime law against Seaport Marine and Odyssea Marine. Plaintiff contends that the wage assignment was "unauthorized and unlawful,"

and demands "the balance of [his] wages allotted and forwarded to and retained by Seaport Marine." (Doc. 1, ¶ 18.)[1]

All three parties now move for summary judgment as to the Seaman's Claim for Wages. Although the litigants have collectively devoted more than 120 pages of briefing to the dueling Rule 56 motions, the issue presented is actually quite narrow, to-wit: On a set of undisputed material facts, does general maritime law entitle Smith to recover agreed placement fees paid out by his employer pursuant to a written wage assignment that contains the word "irrevocable"?

## II. Relevant Facts.[2]

Seaport Marine is a Mobile, Alabama-based company that provides employment placement services for seamen. (Bender Aff. (doc. 49-1), at 1.) Being a for-profit business, Seaport Marine naturally does not provide these services gratis, but charges its clients a placement fee. (*Id.* at 2, 4.) In late 2010, Wilbur Smith sought out Seaport Marine's help in securing a job. (*Id.* at 2.) With Seaport Marine's assistance, Smith was placed at Odyssea Marine in June 2011. (*Id.*) Smith was satisfied with the job assignment that Seaport Marine procured for him. (Smith Dep. (doc. 66, Exh. A), at 30.)

---

[1]    As initially formulated, Smith's Complaint also brought a half-dozen other claims, including causes of action for conversion (Count II), conspiracy (Count III), equitable rescission/ money had and received (Count IV), legal restitution / breach of contract (Count V), breach of fiduciary duty (Count VI), and civil RICO violation (Count VII). An Order (doc. 27) entered on January 28, 2013 dismissed Count VII and certain aspects of the other claims. And on June 10, 2011, the undersigned entered an Order (doc. 60) dismissing Counts II through VII with prejudice pursuant to a stipulation signed and agreed upon by counsel for all parties. Thus, Smith's only remaining claim against Seaport Marine and Odyssea Marine is Count I, which is framed as a "Seaman's Claim for Wages" under general maritime law.

[2]    The parties agree on the vast majority of facts that are material to Smith's lone remaining claim. Nonetheless, to the extent that any disputed facts persist, the Court construes the record, including all evidence and factual inferences, in the light most favorable to the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). As to each cross-motion for summary judgment, then, the record will be viewed in the light most favorable to the non-movant. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept [non-movant]'s version of the facts drawing all justifiable inferences in [non-movant]'s favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

In exchange for these placement services, Smith executed a series of three agreements in Seaport Marine's favor in October 2010.  First, Smith signed a one-page form "Employment Placement Contract" (the "Placement Contract"), in which he agreed that if he accepted a job offer referred by Seaport Marine, he would pay Seaport Marine a fee totaling "fourteen days pay based on your starting daily gross rate at time of acceptance." (Smith Decl. (doc. 47-1), Exh. 1.) The Placement Contract specified that "[p]ayments will be made in installments until the fee is paid in its entirety," with payments spread across six equal installments of wages paid on a biweekly basis.  (*Id.*)  In this agreement, Smith expressly "acknowledge[d] that payroll checks from employer shall be sent to SEAPORT MARINE, INC. until all advancements and fee are paid in full." (*Id.* (emphasis omitted).)  Second, Smith executed a one-page "Special Power of Attorney" (the "POA") in which he authorized Seaport Marine "[t]o endorse and deposit into the account of SEAPORT MARINE, INC. at the Wachovia Bank[,] a banking institution, the proceeds of my check from my employer." (Smith Decl., Exh. 2.)  Third, Smith signed a one-page "Paycheck Mailing Agreement" (the "PMA") authorizing his employer to mail his payroll checks directly to Seaport Marine until the total agreed fee had been collected.  (Smith Decl., Exh. 3.)  Of particular note for this litigation, the PMA specified, "This agreement is **irrevocable** until installment payments totaling \$_____ have been paid to said employment service" (*id.* (emphasis added)), after which time the employer was to mail payroll checks directly to Smith's home address in Gretna, Louisiana.  Smith read these documents before submitting them to Seaport Marine.  (Smith Dep., at 29.)[3]

Odyssea Marine is a marine transportation and vessel operating company in the offshore oil and gas industry.  (Fontenot Aff. (doc. 67, Exh. A), ¶ 2.)  Smith was employed by Odyssea Marine as a Qualified Member of the Engine Department from June 20, 2011 through March 1, 2012.  (*Id.*, ¶ 3.)  Odyssea Marine neither drafted nor presented to Smith the Placement Contract, POA, or PMA that he executed in Seaport Marine's favor.  (*Id.*, ¶ 5.)  Odyssea Marine had no

_____

[3]         Smith was no neophyte in these matters.  Indeed, at the time, Smith was already familiar with the practices of employment placement firms, including collection of fees out of his first few paychecks via an assignment of wages, because he had submitted to that process with other companies before he ever contracted with Seaport Marine.  (Smith Dep., at 24-26, 30, 33.) He assented to this arrangement with Seaport Marine in late 2010 because he "needed some money to pay some bills." (*Id.* at 33.)

direct involvement in Smith's execution of those documents or his contractual relationship with Seaport Marine. (*Id.*) Odyssea Marine did not provide legal advice to Smith regarding the agreements he executed with Seaport Marine, nor did it endeavor to interfere with those agreements. (O'Bryan Decl. (doc. 47-7), at Exh. 1.) Instead, Odyssea Marine accommodated the stated preferences of its employee (Smith) with respect to assignment of his wages to the placement company that had found him a job.

For a time, Odyssea Marine sent Smith's paychecks to Seaport Marine. (Smith Dep., at 29.) This practice continued until Smith had paid Seaport Marine the agreed fee of two weeks' pay, after which Odyssea Marine no longer forwarded Smith's checks to Seaport Marine. (*Id.*) Through this process, Odyssea Marine simply followed the clear instructions in the PMA that Smith had executed. (Fontenot Aff., ¶¶ 6-7.) At no time did Smith voice any complaints to Seaport Marine about the agreed-upon manner in which it collected the agreed-upon fee. (Smith Dep., at 29-30.) Nor did he ever object to Odyssea Marine forwarding his paycheck to Seaport Marine. (Fontenot Aff., ¶ 6.) At no time did Smith request or demand that Odyssea Marine stop sending his paychecks to Seaport Marine, or that Seaport Marine stop receiving his checks. (Smith Dep., at 30-31.) Odyssea Marine did not retain any funds owed to Smith, but paid out all compensation he earned in accordance with his instructions. (Fontenot Aff., ¶ 7.)[4]

Record materials confirm that the mechanics of Seaport Marine's recoupment of its placement fee were as follows: For six consecutive biweekly pay periods ranging from July 2011 through September 2011, Odyssea Marine sent Smith's entire check to Seaport Marine. That defendant deposited Smith's check in its bank account, then sent Smith a separate check in the amount of the difference between his net pay from Odyssea Marine and the installment payment owed to Seaport Marine. (Smith Decl., Exhs. 4 & 5.) For example, on August 10, 2013, Odyssea Marine sent Smith's paycheck for $2,430.10 to Seaport Marine. The next day,

---

[4]       By all appearances, Seaport Marine handled the wage assignment and repayment of wages to Smith in exactly the manner that the parties had agreed. Smith's subjective satisfaction with Seaport Marine's performance is evinced by the fact that in June 2012 (approximately three months after his employment with Odyssea Marine concluded), Smith contacted Seaport Marine with a new placement request. (Bender Aff., ¶ 4.) In other words, Smith was so favorably disposed toward Seaport Marine based on his previous dealings that he returned to that company for placement assistance as a repeat customer the next time he was looking for work.

Seaport Marine issued a check to Smith in the amount of $1,823.44, after deducting the remaining $606.66 as an installment payment for employment placement services.  (*Id.*)

Smith now asserts a general maritime claim for seaman's wages against both Seaport Marine and Odyssea Marine.  He does not attack the sufficiency, quality or value of Seaport Marine's placement services.  He does not suggest that the charged placement fee was unearned by Seaport Marine, was never voluntarily agreed to by him, was somehow different than the parties' agreement, or was excessive, unreasonable, unfair or unconscionable.  He does not argue that Odyssea Marine underpaid him or deviated from the payment instructions in the PMA that he signed.  Rather, the legal theory undergirding Smith's seaman's claim for wages is that the PMA was unlawful and illegal pursuant to 46 U.S.C. § 11109(b), and that such invalidity, without more, entitles Smith to recover "the balance of [his] wages allotted and forwarded to and retained by Seaport Marine as unauthorized and unlawful allotments."  (Doc. 1, ¶ 18.)  Simply put, Smith demands that defendants repay him the $3,640 placement fee because he contends that the assignment of wages he signed for Seaport Marine's benefit, the manner in which Seaport Marine collected that fee, and Odyssea Marine's unquestioning acquiescence in that agreed-upon methodology were improper and illegal.  Even though the placement fee was rightfully earned and payable to Seaport Marine for the services it provided him, plaintiff's contention is that Seaport Marine forfeited it by utilizing an unlawful method of collection.[5]

### III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact

---

[5]    A dispute over an employment agency's method of collecting an admittedly earned $3,640 placement fee hardly seems worthy of a major federal litigation battle, in which accrued attorney's fees will outstrip exponentially (and probably have done so already) the disputed payments.  However, the financial calculus shifts when one recalls that plaintiff seeks class certification, with the proposed class to consist of all "crewmembers who have assigned their wages before paid to Seaport."  (Doc. 1, at 15.)  The deadline for Rule 23 motions has not yet expired, and the task at hand for this Court is to consider whether Smith's seaman's wages claim survives summary judgment.  If it does not, then the question of whether this action could or should be certified as a class would become moot, inasmuch as Smith would have no viable claims and would therefore be ill-suited to represent the interests of the putative class.

that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to

show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make

'a sufficient showing on an essential element of her case with respect to which she has the burden

of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v.

Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party

has met its burden, the court must stop short of weighing the evidence and making credibility

determinations of the truth of the matter. Instead, the evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-

Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

"Summary judgment is justified only for those cases devoid of any need for factual

determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987)

(citation omitted).

Both sides have moved for summary judgment on plaintiff's general maritime claim for

seaman's wages. The law is clear that "[t]he applicable Rule 56 standard is not affected by the

filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F.

Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*,

620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same). The Eleventh Circuit has explained that

"[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting

summary judgment unless one of the parties is entitled to judgment as a matter of law on facts

that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)

(citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)

("the filing of cross motions for summary judgment does not necessarily indicate that there is no

dispute as to a material fact, or have the effect of submitting the cause to a plenary determination

on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual

dispute where they reflect general agreement by the parties as to the dispositive legal theories

and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F.

Supp.2d at 1307. Such is the case here.[6]

---

[6]        In his summary judgment briefs, plaintiff relies on *Garrett v. Moore-McCormack

Co.*, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942), and its progeny to argue that "the burden

(Continued)

## IV.   Analysis.

### A.   The Text and Meaning of 46 U.S.C. § 11109(b).

As this Court has previously recognized and as all parties now acknowledge, Smith's cause of action for wages is not a statutory claim, but is instead predicated on general maritime law.  *See Smith v. Seaport Marine, Inc.*, 919 F. Supp.2d 1267, 1275 (S.D. Ala. 2013) ("Smith has not asserted a statutory claim against defendants under § 11109(b).  Rather, he has brought a general maritime law claim for wages.") (footnote omitted).  That said, it is also true that plaintiff relies on 46 U.S.C. § 11109(b) as the legal foundation of his claim to relief under general maritime law.  In that regard, plaintiff stakes himself to the position that "[t]his general maritime law claim for wages is predicated on Seaport's violation of Section 11109(b) in offering its recruitment services *vis-à-vis* an 'irrevocable' assignment that allowed it to deduct Plaintiff's wages into its coffers."  (Doc. 75, at 6.)  Given the centrality of § 11109(b) to Smith's claim, the appropriate starting point for the summary judgment analysis is to examine the statute and its text, history and interpretation.

Subsection (b) limits the enforceability of seaman's assignments of wages, as follows: "An assignment or sale of wages or salvage made before the payment of wages does not bind the

---

is on Defendants[] to demonstrate a question of fact as to why the [assignment of wages agreement signed by Smith] should not be set aside because of overbearing conduct, duress, or coercion, fraud or overreaching."  (Doc. 47, at 10 (citation and internal markings omitted).)  But plaintiff's pleadings do not allege in the remaining cause of action that the Placement Contract, POA or PMA were the product of duress, coercion, fraud and so on.  (*See* doc. 1, at ¶¶ 15-18.) Such theories simply are not part of Smith's seaman's claim for wages, and he cannot utilize his summary judgment briefing to effectuate a *de facto* amendment of the Complaint.  *See, e.g., American Federation of State, County and Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment or one advocating summary judgment.") (citation and internal quotation marks omitted).  The only wrongdoing ascribed to defendants in the Complaint with regard to the seaman's wages claim is that the Paycheck Mailing Agreement was "***based on a non-binding, yet irrevocable assignment of wages before paid*** resulting in unauthorized and unlawful allotments."  (Doc. 1, ¶ 18 (emphasis added).)  In other words, plaintiff's pleadings framed his claim as being rooted in a technical violation of 46 U.S.C. § 11109(b)'s provision that a seaman's assignment of wages is not binding.  Having committed himself to that theory, Smith cannot now reimagine the claim on summary judgment to one in which he bandies about heretofore-unasserted notions of "overbearing conduct, duress, or coercion, fraud or overreaching," then says that defendants bear the burden of disproving such defects.

party making it, except allotments authorized by section 10315 of this title." 46 U.S.C. § 11109(b).[7] The "allotments authorized by section 10315" language has no bearing on this dispute, inasmuch as that exception concerns assignments in which a seaman allots his wages "to the seaman's grandparents, parents, spouse, sister, brother, or children;" "to an agency designated by the Secretary of the Treasury … to purchase bonds for the seaman;" and "for deposits to be made in an account for savings or investment opened by the seaman and maintained in the seaman's name at a savings bank or a savings institution." 46 U.S.C. § 10315(a)(1)-(3). The facts of this case do not fit any of those binding allotment scenarios; therefore, Smith's pre-payment assignment of wages to Seaport Marine was not binding on him, under the plain language of § 11109(b).

Again, the gist of this lawsuit is that Smith is attempting to parlay § 11109(b) into a claim for seaman's wages against Seaport Marine and Odyssea Marine. This is a general maritime claim, as no statutory claim is available to Smith. After all, § 11109(b) does not provide a private right of action or purport to create any remedy (in damages or otherwise) for a seaman who has executed a non-binding assignment of wages. The critical questions animating all parties' Rule 56 motions are whether (i) defendants' conduct constitutes a violation of this code section, and (ii) if so, whether plaintiff's requested damages remedy is cognizable under the general maritime law.

As to the first question, looking to case authorities, learned treatises, or other interpretive sources for direct insights into the meaning and application of § 11109(b) is an exercise in futility. The slate is largely blank. This statute was enacted in 1983 as a revision and recodification of a predecessor statute found at 46 U.S.C. § 601. Despite the fact that § 11109(b) is 30 years old, prior to this case (and plaintiff's counsel's filing of companion litigation in this

---

[7]     The other subsections of 46 U.S.C. § 11109 are not relevant. In particular, subsection (a) addresses the narrow circumstances in which a seaman's wages may be subject to attachment or arrestment from any court, and subsection (c) extends the seaman's protections in § 11109 to "an individual employed on a fishing vessel or any fish processing vessel." 46 U.S.C. § 11109(c). Although defendants argued at the Rule 12(b)(6) stage that § 11109 applies only to fishing vessels and fish processing vessels, this Court expressly found it to apply to seamen such as Smith. *See Smith*, 919 F. Supp.2d at 1274 ("the Court rejects Seaport's legally unfounded contention that § 11109 is confined to the context of a fishing vessel or fish processing vessel, but instead finds it applicable to all seamen, as that term is defined at 46 U.S.C. § 10101(3)").

District Court styled *Jurich v. Compass Marine, Inc.*, Civil Action No. 12-0176-WS-B), only one federal decision in a widely-used online legal database had ever cited that section, and that unpublished opinion lacks persuasive insights.[8]  Thus, Smith's claim against Seaport Marine and Odyssea Marine turns on a decades-old statute that, for all intents and purposes, has never been litigated, much less been held to give rise to a general maritime claim for seaman's wages in the event of a violation.  Expanding the search beyond case authorities to encompass treatises, law reviews, commentators and so on likewise yields precious little illumination.

The parties' extensive summary judgment briefs reflect that their own research into § 11109(b) has disclosed a dearth of on-point authority.[9]  Nonetheless, the parties' submissions do reflect that more than a century ago, the Supreme Court explained that a predecessor statute of § 11109 was designed to protect a seaman's admiralty right to recover unpaid wages via a maritime lien attaching in an *in rem* action against the vessel itself, and to avoid a circumstance in which the seaman would "be turned ashore with nothing in his pocket" because of garnishment, attachment or arrest of wages.  *Wilder v. Inter-Island Steam Nav. Co.*, 211 U.S. 239, 248, 29 S.Ct. 58, 53 L.Ed. 164 (1908).  The *Wilder* Court reasoned that typically, "the sailor's []only means of subsistence on shore are his wages earned at sea.  If these may be

---

[8]    That case, *Mitchell v. Metco, Inc.*, 2006 WL 6549488 (S.D. Tex. Nov. 1, 2006), discussed § 11109(b) only superficially, with the totality of its analysis being as follows: "Although there is a statute that expressly provides that an assignment of wages made before the wages are paid is not binding, that statute applies only to individuals employed on a fishing vessel or fish processing vessel.  46 U.S.C. § 11109(b)-(c) (2006).  The parties agree that the *Glorita* was not engaged in the business of fishing or fish processing, so its crewmen are not governed by this statute." *Id.* at *2.  *Mitchell* does not speak to the sorts of conduct that violate § 11109(b), much less the remedies available to a seaman for such violations.  As discussed in footnote 7, *supra*, *Mitchell*'s conclusion that § 11109(b) has no application beyond the fishing / fish processing vessel context is also unhelpful here.

[9]    To be sure, the parties' filings cite numerous cases that involve circumstances such as an employer's withholdings or deductions from seaman's wages that are proscribed, regulated or otherwise limited by statutes such as 46 U.S.C. §§ 10314, 10505 or the various predecessors of those code sections.  Such authorities are of minimal utility here because of material differences in the pertinent statutory schemes.  Besides, as plaintiff acknowledges, "[n]o statutory wage recovery statute covers Plaintiff." (Doc. 65, at 6.)  For that reason, cases applying "statutory wage recovery statutes" that Smith admits do not cover his circumstances are of little assistance in ascertaining the meaning of § 11109(b) (which is not a statutory wage recovery statute), or the existence and scope of any remedy for a purported violation of same.

stopped by an attachment suit the instant his ship is moored to the wharf, a new hardship is added to a vocation already subject to its full share of the ills of life." *Id.* at 249 (citation omitted). *Wilder* thus provides some limited insight as to the policy objectives that § 11109's predecessor was designed to advance.

### B.    The Role of the Judiciary in Protecting Seamen.

With no on-point authorities, plaintiff seeks to derive a general maritime claim for payment of wages from what he maintains is defendants' violation of 46 U.S.C. § 11109(b). The doctrinal mechanism through which plaintiff would perform this bit of legal alchemy is the weathered "wards of admiralty" tenet of maritime jurisprudence.

"The character of maritime law as a mixture of statutes and judicial standards, an amalgam of traditional common-law rules, modifications of those rules, and newly created rules, … accounts for the large part we have taken in working out the governing maritime tort principles." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 508 n.21, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (citation and internal quotation marks omitted). In performing this task of sculpting maritime law remedies and protections from a hodgepodge of statutes, rules, and common-law principles, federal courts historically emphasized that "seamen have always been regarded as wards of the admiralty, and their rights, wrongs, and injuries a special subject of the admiralty jurisdiction." *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1294 (11th Cir. 2011) (citation omitted).[10] The traditional policy justification for affording seamen such special solicitude is as follows: "A seaman isolated on a ship on the high seas is often vulnerable to the exploitation of his employer. Moreover, there exists a great inequality in bargaining position between large shipowners and unsophisticated seamen. Shipowners generally control the availability and terms of employment." *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1152 (9th Cir. 2008) (citation omitted).

---

[10]    *See also McBride v. Estis Well Service, LLC*, --- F.3d ----, 2013 WL 5474616, *8 n.15 (5th Cir. Oct. 2, 2013) ("Seamen have long been characterized as 'wards of admiralty' deserving special protection under maritime law."); *Delaware River & Bay Authority v. Kopacz*, 584 F.3d 622, 625 (3rd Cir. 2009) (sailors' union contracts have "not diminished our historic solicitude toward seamen, who continue to be viewed by the law as 'wards of the admiralty'") (citation omitted).

Although the "wards of admiralty" notion has deep roots that may be traced back nearly 200 years, in recent years federal courts have increasingly expressed reservations about the continued vitality of that doctrine, or at least its breadth.  In certain circumstances, federal courts have declined to rely on it to fill in gaps left by Congress and existing common-law rules.  One commentator has observed that "[t]he wardship doctrine … has lost some of its luster and thereby, seamen have lost some support in the courts."  2 Robert Force & Martin J. Norris, *The Law of Seamen* § 26:4 (5th ed.).  Most notably, the Supreme Court cast a shadow on the doctrine via the following reasoning:

> "We no longer live in an era when seamen and their loved ones must look primarily to the courts as a source of substantive legal protection from injury and death; Congress and the States have legislated extensively in these areas.  In this era, an admiralty court should look primarily to these legislative enactments for policy guidance.  We may supplement these statutory remedies where doing so would achieve the uniform vindication of such policies consistent with our constitutional mandate, but we must also keep strictly within the limits imposed by Congress.  Congress retains superior authority in these matters, and an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation.  These statutes both direct and delimit our actions."

*Miles v. Apex Marine Corp.*, 498 U.S. 19, 27, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); *see also Atlantic Sounding Co. v. Townsend*, 557 U.S. 404, 420, 129 S.Ct. 2561, 174 L.Ed.2d 382 (2009) ("The reasoning of *Miles* remains sound.").[11]

_____

[11]     Justice Alito recently summarized the teachings and implications of *Miles* as follows:  "*Miles* thus instructs that, in exercising our authority to develop general maritime law, we should be guided primarily by the policy choices reflected in statutes creating closely related claims. … *Miles* teaches that if a form of relief is not available on a statutory claim, we should be reluctant to permit such relief on a similar claim brought under general maritime law." *Atlantic Sounding*, 557 U.S. at 426 (Alito, J., dissenting).  And *Miles* was hardly an anomalous bolt from the blue in distancing the continued development of general maritime law from the wardship doctrine; to the contrary, federal appellate rulings presaged *Miles*' reasoning.  *See Feemster v. BJ-Titan Services Co./Titan Services, Inc.*, 873 F.2d 91 (5th Cir. 1989) (where tugboat captain was fired for refusing to violate federal statute for safe vessel operation and then brought general maritime law claim for wrongful discharge, court declined to create a new claim, reasoning that "it is inappropriate for us to engraft on this congressional act an additional provision granting a private cause of action," where "Congress, in enacting the statutes on which Feemster relies, clearly chose not to do so"); *see generally C.N.R. Atkin v. Smith,* 137 F.3d 1169, 1171-72 (9th Cir. 1998) ("[T]his preference for equitable principles in admiralty cases only applies when there is no applicable statute.").

That said, rumors of the wardship doctrine's demise appear exaggerated. Even in the wake of *Miles*, the Eleventh Circuit has continued to view seaman as wards of admiralty and has protected them accordingly. *See Lindo*, 652 F.3d at 1294 (acknowledging seamen's status "as a favored class" and explaining that "seamen like Lindo have traditionally been afforded special legal remedies"). Far from the absolutist, polar-opposite positions taken by the parties in their summary judgment briefs, the actual state of the law with respect to "wards of admiralty" is that the doctrine remains in play, but that the liberality of its use to fashion new general maritime law remedies supplementing those fixed by Congress is a subject of ongoing debate at the highest echelons of the American judiciary.[12]

**C.    Whether Defendants Violated § 11109(b) and, if so, Whether a General Maritime Law Remedy Exists.**

  *1.    The Record Does Not Support a Conclusion that Defendants Violated § 11109(b).*

Plaintiff's briefs advance the theory that a violation of § 11109(b) is cognizable as a heretofore-unrecognized general maritime law claim for seaman's wages under the "wards of admiralty" doctrine. By contrast, defendants' briefs insist that the *Miles* reasoning confines Smith's remedies to the text of § 11109 (which provides only that a seaman's wage assignments are not binding) and does not allow judicial creation of a supplemental remedy for violation of the statute.[13] Thus, both sides invite the Court to issue grand pronouncements about whether violations of § 11109(b) are or are not actionable under general maritime law.

---

[12]    *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), illustrates the point. In a footnote in the majority opinion, Justice Souter asserted that "[w]here there is a need for a new remedial maritime rule, past precedent argues for our setting a judicially derived standard, subject of course to congressional revision." 554 U.S. at 508 n.21. In a partial dissent, however, Justice Stevens leaned on *Miles* to opine that "an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation" and that courts should be circumspect about creating new remedies where Congress has chosen to stay its hand. 554 U.S. at 516-19.

[13]    Defendants bolster their position by quoting passages from *Miles* such as, "We sail in occupied waters. Maritime tort law is now dominated by federal statute, and we are not free to expand remedies at will simply because it might work to the benefit of seamen and those dependent upon them." *Miles*, 498 U.S. at 36. Furthermore, defendants cite to other (admittedly inapplicable) statutes enacted at the same time as 46 U.S.C. § 11109(b) in which Congress created specific monetary enforcement mechanisms. *See, e.g.,* 46 U.S.C. § 10313(c) (providing that "[t]he courts are available to the seaman for the enforcement of" certain wage payment (Continued)

The Court need not decide whether a general maritime law wage-recovery remedy ever lies for violations of § 11109(b), notwithstanding the weakened status of the wardship doctrine and Congress's apparently deliberate choice not to create any such remedy. The reason is that the summary judgment record, viewed in the light most favorable to Smith, does not establish a violation of § 11109(b). Recall that the statutory text reads, in relevant part, that "[a]n assignment or sale of wages … made before the payment of wages does not bind the party making it." 46 U.S.C. § 11109(b). That's all it says. Section 11109(b) does not specify that such assignments of wages are unlawful, that any contract purporting to contain such an assignment is void, that a maritime employment agency's contract containing such an assignment is illegal, that an employer receiving such an agreement is in violation of the statute unless it provides legal advice to the seaman and/or dishonors the agreement, or the like. *See Smith*, 919 F. Supp.2d at 1279 n.14 ("Section 11109(b) provides merely that an assignment such as that contained in the Paycheck Mailing Agreement 'does not bind the party making it.' The

_____

obligations applicable to foreign and intercoastal voyages); 46 U.S.C. § 10314 (providing for civil penalties of up to $500 when a person pays a seaman's advance wages to another person, in certain foreign and intercoastal voyages); 46 U.S.C. § 10504 (providing that "[t]he courts are available to the seaman for the enforcement of" certain wage payment obligations applicable to coastwise voyages); 46 U.S.C. § 10505 (providing for civil penalties of up to $5,000 when a person pays a seaman's advance wages to another person, in certain coastwise voyages). These statutes show that Congress knew how to create a remedy for seaman's wage payment violations, such that its election not to do so in the context of § 11109(b) must have been the product of a deliberate legislative choice that the courts should not casually override in the name of protectionism. *See generally Atlantic Sounding*, 557 U.S. at 422 ("We assume that Congress is aware of existing law when it passes legislation."). Plaintiff's rebuttal to this argument (*i.e.*, that "[i]t would be an anomalous situation" if employment agencies were subject to penalties for recruitment fees culled directly from seaman's wages on foreign, intercoastal, and coastwise voyages, but "would be given a free pass" here) is best presented to the legislative branch, not the judiciary. (*See* doc. 47, at 22.) And plaintiff's rejoinder that *Miles* addresses "legal protection from injury and death," whereas this case is about seaman's wages, is unpersuasive. Congress and the states have legislated extensively about wage issues affecting seamen (just as they have about injury and death of seamen), so the *Miles* rationale cannot be so easily cast aside in this context.

statute does not declare such an assignment (or any allotment flowing from such an assignment) to be 'unauthorized and unlawful.'").[14]

In short, nothing in § 11109(b) prohibited Seaport Marine from asking Smith to assign a portion of his wages to it until such time as the agreed-upon placement fee had been paid in full. Nothing in § 11109(b) barred Odyssea Marine from honoring the wishes of Seaport Marine and Smith (as embodied in the PMA furnished to it, and in the absence of any objection, inquiry or complaint to the contrary by Smith) by assigning Smith's paychecks to Seaport Marine for a designated period of time. And nothing in § 11109(b) required Odyssea Marine proactively and unilaterally to counsel Smith as to his legal options vis a vis the PMA and § 11109(b) before assigning each of his first six paychecks to Seaport Marine. Simply put, none of the conduct that plaintiff ascribes to defendants would amount to a violation of § 11109(b).

Again, plaintiff's unequivocal position is that "[]his general maritime law claim for wages is predicated on Seaport's violation of Section 11109(b)" (doc. 75, at 6) and that Odyssea Marine is liable because it "took advantage of Seaport's violation of Section 11109(b)" (doc. 74, at 5.) Without a violation of § 11109(b), plaintiff's general maritime claim for seaman's wages washes away; therefore, the Court will not engage in the hypothetical exercise of offering advisory opinions as to whether general maritime law would recognize such a claim via the "wards of admiralty" doctrine if plaintiff had indeed established a violation of § 11109(b).

> 2. *Plaintiff Cannot Invalidate his Contractual Relationship with Seaport Marine because of the Word "Irrevocable."*

In an effort to establish a § 11109(b) violation, plaintiff focuses on a single word in the PMA, to-wit: "irrevocable." Specifically, the Paycheck Mailing Agreement that Smith signed includes a sentence reading, "This agreement is irrevocable until installment payments totaling $_____ have been paid to" Seaport Marine. (Doc. 47, Exh. 3.) In plaintiff's view, inclusion of the single word "irrevocable" rendered the agreement void, unlawful, unenforceable, and violative of § 11109(b).[15]

---

[14]     Plaintiff candidly admits as much in summary judgment briefing. (*See* doc. 74, at 5 ("Section 11109(b) does not prohibit assignment of wages before they are paid. It only makes them non-binding.").)

[15]     This sentiment is oft-repeated in plaintiff's summary judgment submissions. *See, e.g.,* doc. 47, at 13 ("the irrevocable allotment note is void as violative of public policy because it (Continued)

Without a doubt, the term "irrevocable" is inconsistent with the text of § 11109(b), which provides that an assignment like the PMA "does not bind the party making it." So the PMA's statement that it was "irrevocable" until the placement fee had been collected is incorrect as a matter of law, because under § 11109(b) the PMA did not bind Smith. That discrepancy might help Smith sustain a general maritime law cause of action if there were a shred of evidence in the record that (i) Seaport Marine enforced the "irrevocable" contract term against Smith, (ii) Smith ever sought to revoke the PMA, (iii) Smith ever inquired of anyone about whether the PMA was binding or revocable (*i.e.*, that he was misled by defendants), (iv) Smith relied on the word "irrevocable" in the PMA (*i.e.*, that he was deterred by its presence from casting aside the PMA and canceling the wage assignment arrangement), or (v) Smith would have done something differently if the word "irrevocable" had been omitted from the PMA. The trouble is, no such evidence exists. There is no indication that the term "irrevocable" – on which plaintiff literally rests his entire case – factored into the course of dealings between these parties in any way, shape or form. On this record, it made no practical difference to Smith whether the PMA used the word "irrevocable" or not; indeed, there is no evidence that he even knew it was there. What plaintiff's claim amounts to, then, is an attempt to gin up a general maritime law claim for seaman's wages from a solitary word in the PMA that was, for all intents and purposes, surplusage because it was functionally irrelevant to Smith's dealings with Seaport Marine and Odyssea Marine.[16]

---

misstates Plaintiff's rights – the allotment note is 'irrevocable' versus non-binding"); doc. 75, at 2 ("Seaport's PMA being shown to read 'irrevocable' makes it overreaching and void ab initio"), 4-5 ("Seaport inserted a term that is contrary to an assignment construction statute which, therefore, renders the assignment void, illegal, unlawful, overreaching and unenforceable."), 5 ("the mislabeling of the PMA as 'irrevocable' is the bedrock of a contract to contain terms that 11109(b) does provide the assignment construction rule justifying the relief requested, vis-à-vis a seaman's claim for wages, i.e., Seaport forfeiting Smith's wages it retained under the false pretense of an 'irrevocable' PMA.").

[16]     Returning to the original point, the Court concludes that, without more, inclusion of the term "irrevocable" does not amount to a violation of § 11109(b). Of course, that term conflicts with the statutory guideline that assignments of seaman's wages are non-binding. But nothing on the face of § 11109(b) would make it unlawful for a contract to contain terms that conflict with the statute. Plaintiff's cited authority is distinguishable. *See, e.g., Boyd v. Grand Trunk Western R. Co.*, 338 U.S. 263, 265, 70 S.Ct. 26, 94 L.Ed. 55 (1949) (contract that (Continued)

The problems with plaintiff's theory of recovery run deeper. From a technical inconsistency between the PMA and the provisions of § 11109(b), plaintiff seeks to bootstrap a claim that would wipe out his entire contractual arrangement with Seaport Marine, relieving him of his contractual burdens after he had fully received and enjoyed the corresponding benefits. In other words, plaintiff's claim is that the word "irrevocable" in the PMA not only invalidated his consent to the assignment of his Odyssea Marine paychecks to Seaport Marine, but also irretrievably tainted the underlying Placement Contract, which was the source of Smith's obligation to pay a placement fee to Seaport Marine. To achieve such a result, plaintiff exhorts the Court to view the Placement Contract, POA and PMA documents as a single indivisible agreement, and to find that a technical error in one necessarily brings the whole crashing down. Through this mechanism, Smith would have the Court rule that Seaport Marine cannot retain the agreed-upon placement fee it earned in providing satisfactory placement services to Smith, but must instead disgorge the entire $3,640 amount to plaintiff to atone for its transgression of using the term "irrevocable" (which no one apparently noticed, questioned, relied upon or enforced) in the PMA.

Plaintiff's application of contract law in this manner is problematic, at best. With a sleight of hand and no citations to authorities or record evidence of the parties' intent, he would turn three distinct (albeit related) agreements into a unitary, "co-dependent" contract, in which any flaw in the PMA is fatal to the Placement Contract. With no factual support, he plucks a single, out-of-context sentence from a 70-year old Supreme Court case about a shipbuilding contract and proclaims that "[t]here would have been no bargain whatever" between Smith and Seaport Marine but for the word "irrevocable" in the PMA. (Doc. 47, at 12.)[17] The Court cannot

_____

conflicted with the Federal Employers' Liability Act was void because the Act included a Congressional mandate that "[a]ny contract … the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this Act, shall to that extent be void"). To be sure, the conflicting terms would not be enforceable, and any attempt to enforce such terms would indeed be unlawful. But that's just it: Seaport Marine never attempted to enforce the "irrevocable" character of the PMA against Smith. Plaintiff has not alleged otherwise, much less offered record evidence to support that position. The Court thus finds that the record taken in the light most favorable to Smith does not establish a violation of § 11109(b).

[17] In a related attempt to use the term "irrevocable" to invalidate the PMA and the accompanying contracts, plaintiff insists that "a fundamental rule of law is that a contract made (Continued)

make such a vast, unsupported leap. The authorities on which Smith relies for the proposition that the term "irrevocable" in the PMA "creates a conclusive presumption of an intent to deceive" are obviously distinguishable and unhelpful. *See, e.g., Gueho v. Diamond M. Drilling Co.*, 524 F.2d 986, 987 (5th Cir. 1975) (setting aside agreement where "there was ample evidence to demonstrate that the plaintiff was led to believe that he would maintain his employment," but

---

in violation of a statute is void." (Doc. 77, at 2.) This formulation sweeps far too broadly. In actuality, a term that conflicts with a statute may be unenforceable, but it does not automatically invalidate the entire contract. A contract is not rendered void when one collateral term (that the parties never enforced and that never affected the parties' course of dealing) is in conflict with a statute, if the object of the contract remains legal and consistent with public policy. *See generally Alliance Metals, Inc., of Atlanta v. Hinely Industries, Inc.*, 222 F.3d 895, 899 (11th Cir. 2000) ("For a contract to be deemed unenforceable as illegal or contrary to public policy, ***its purpose or object must be contrary to a law or policy***") (emphasis added); *In re Diego's Inc.*, 88 F.3d 775, 789 (9th Cir. 1996) ("a lawful contract will be enforced even when a collateral agreement is illegal"); *Stephens v. Trust for Public Land*, 475 F. Supp.2d 1299, 1316 (N.D. Ga. 2007) (rule that illegal contracts are void "has no application where the object of the contract is not illegal or against public policy, but where the illegality is only collateral or remotely connected to the contract") (citations omitted); *Wechsler v. Hunt Health Systems, Ltd.*, 216 F. Supp.2d 347, 354 (S.D.N.Y. 2002) ("if a contract is merely collaterally and not directly connected with the illegal act, the contract will be valid and enforceable"). "The general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts. … The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests," particularly where the party attacking the contract "has had the benefit of performance by the other party" and now seeks "to avoid his own promise." *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356-57, 51 S.Ct. 476, 75 L.Ed. 112 (1931); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 82 n.7, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) ("the promisor may not avoid performing a perfectly legal promise because he has also made a separate, illegal undertaking"); *Steele v. Drummond*, 275 U.S. 199, 205, 48 S.Ct. 53, 72 L.Ed. 238 (1927) ("It is only in clear cases that contracts will be held void [for illegality]. The principle must be cautiously applied to guard against confusion and injustice."); *Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1074 (6th Cir. 1997) ("Courts should be hesitant to allow parties to escape their obligations under the pretext of public policy or illegality.") (citation and internal quotations omitted). Plaintiff's sweeping arguments of illegality of the entire contract (whose purpose and object were lawful) – all for the unjust, unfair and unreasonable purpose of allowing him to retain the benefits of Seaport Marine's performance while relieving him of the burdens of his own performance – proceed in derogation of the foregoing well-entrenched, bedrock principles of contract law.

employer terminated seaman's employment on the evening of the day of the agreement).[18] And the treatise he cites for the proposition that any contract involving a seaman "will unhesitantly be set aside by an admiralty court if there is evidence that the seaman was not actually informed of his rights" plainly does not apply to Smith's circumstances. (Doc. 65, at 2.)[19]

Notwithstanding these and other defects in plaintiff's application of contract law, the Court resists the temptation to transform this Order into a point-by-point contract law discourse on each analytical error in plaintiff's theory that there was only one agreement, that the agreement was non-severable, and that the word "irrevocable" was an unlawful, fraudulent, deceptive act, and that "irrevocable" magically erases the entire agreement and frees Smith from any obligation to compensate Seaport Marine for the placement services he received. The reason the Court need not delve into such minutiae is that plaintiff has postured this case to be about general maritime law, not contract law. And general maritime law has a crucial feature that prevents Smith from recovering, even if he were correct that defendants' conduct violated § 11109(b) and even if he were correct that the "wards of admiralty" doctrine would fashion a brand-new claim in general maritime law for violations of § 11109(b) where Congress did not. That feature is equity.

---

[18] The weakness in plaintiff's argument is compounded by examination of *United States v. Wilson*, 176 F. 806 (S.D. Fla. 1910). This 103-year old case from Florida, which consists of nothing more than a block recitation of instructions read to a jury in a criminal banking fraud case, is plaintiff's support for the proposition that "[a]n intent to deceive may be conclusively presumed from the doing of an unlawful act," such that "the unlawful irrevocable term in the [PMA] creates a conclusive presumption of an intent to deceive." (Doc. 47, at 15.) Even if *Wilson* had any power to persuade, it does not say what plaintiff says it says. In *Wilson*, the trial court instructed the jury that intent to deceive "may be conclusively presumed from the doing of a wrongful and illegal act, **which necessarily would result in deceiving the bank examiner**." *Wilson*, 176 F. at 809 (emphasis added). Inclusion of the word "irrevocable" in the PMA was not a "wrongful and illegal act" and even if it was, its presence would not "necessarily … result in deceiving" Smith. *Wilson* does not support plaintiff's position.

[19] Specifically, plaintiff cites 2 Robert Force & Martin J. Norris, *The Law of Seamen*, § 24.22 (5th ed. 2003), for this proposition. Section 24:22 deals only with so-called "red releases," which are seaman's releases commonly used by insurance companies. Nothing in that section supports the proposition that every contract entered into by a seaman is subject to vacatur if the other side does not affirmatively explain the seaman's rights to him, acting as his *de facto* legal counselor.

Admiralty jurisdiction and maritime law are firmly grounded in principles of equity. *See Allied Maritime, Inc. v. Descatrade SA*, 620 F.3d 70, 76 (2nd Cir. 2010) ("As a court sitting in admiralty, we may use equitable principles where appropriate to avoid injustice.") (citation and internal quotation marks omitted); *C.N.R. Atkin v. Smith*, 137 F.3d 1169, 1171 (9th Cir. 1998) ("equity is part of the law of admiralty"); *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 1982) ("A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity.") (citation omitted); *Texas Gulf Sulphur Co. v. Blue Stack Towing Co.*, 313 F.2d 359, 362 (5th Cir. 1963) ("In assaying the merits, we reaffirm the view many times expressed that the Admiralty is administered with equitable liberality and a simultaneous freedom from restraints or frustrations occasioned by technicalities or formal imperfections."); *Mascuilli v. United States*, 411 F.2d 867, 873 (3rd Cir. 1969) (referencing "the equitable origins of maritime law"); *Walck v. Discavage*, 741 F. Supp. 88, 90 (E.D. Pa. 1990) (recognizing "the fact that maritime law includes traditional common-law rules and modifications thereof, including discretionary principles of equity"); *Drew Ameroid Int'l v. M/V Green Star*, 681 F. Supp. 1056, 1061 (S.D.N.Y. 1988) ("The maritime law prides itself upon equitable traditions and antecedents."); *Complaint of Valley Towing Service*, 629 F. Supp. 139, 147 (E.D. Mo. 1985) ("Admiralty is essentially the law of equity and courts are privileged to exercise flexibility and award what is fair. The hands of the court are not tied by the rigidity of common law."); *The Denali*, 13 F. Supp. 686, 687 (D. Wash. 1936) ("Admiralty issues are submitted on equitable principles in harmony with rules of justice and expressed rules of procedure, and in consonance with principles of maritime law which pervades the practice of admiralty in this country," such that "the supreme purpose of doing justice is paramount to technical forms"). In that regard, the Supreme Court has emphasized the judiciary's role in "formulating flexible and fair remedies in the law maritime." *Exxon Shipping*, 554 U.S. at 508 n.21 (citations omitted).

The equities do not favor this plaintiff's opportunistic claim for seaman's wages. Smith does not purport to have been misled, tricked or forced to assign his wages to Seaport Marine. Indeed, he does not purport to have been wronged at all. Instead, he seizes on the happenstance of inclusion of the word "irrevocable" in the PMA (a term that was never enforced against him and that he does not purport even to have realized was there) to demand reimbursement of a placement fee that he lawfully agreed to pay Seaport Marine for placement services that Seaport Marine successfully provided, whose benefits he enjoyed in the form of a substantial job

assignment with Odyssea Marine. Smith expresses no dissatisfaction with these placement services. The proof of his contentment is in the pudding, as he approached Seaport Marine some time later as a repeat customer after his Odyssea Marine employment concluded.

The point is that the outcome Smith seeks to derive from the proposed general maritime law remedy he invokes would be contrary to principles of equity. Smith would receive a windfall if this Court were effectively to tear up his Placement Contract after Seaport Marine had fully performed thereunder, and after Smith had received the full benefits of same, all because the PMA contained the word "irrevocable." Again, there is zero record evidence that Smith noticed or cared about the "irrevocable" terminology, or that he ever attempted to revoke the wage assignment or would have attempted to revoke the assignment had he known it to be nonbinding.[20] Nor is there evidence that an overreaching ship owner or third party manipulated, misled or otherwise took advantage of an isolated seaman. To the contrary, this is a case in which plaintiff seizes on a single-word misstep in the PMA to shrug off contractual burdens that he willingly, voluntarily assumed, after he received and enjoyed the corresponding contractual benefits. Why should this Court create from whole cloth a heretofore never-recognized general maritime law remedy under which Smith can invalidate the Placement Contract because of a stray word in the PMA that, by all record evidence, affected neither his understanding nor the parties' course of dealing? That would not be an equitable outcome, much less an appropriate exercise of the judiciary's responsibility to formulate "flexible and fair remedies" under maritime law.[21]

---

[20] If anything, the assignment worked to Smith's benefit just as it did Seaport Marine's. This arrangement allowed for a mutually convenient, administratively painless way for Smith to repay the agreed placement fee in installments even while he was working offshore for Odyssea Marine. This is simply not a circumstance where there was any legitimate concern a la *Wilder v. Inter-Island Steam Nav. Co.* that Smith would "be turned ashore with nothing in his pocket" because he agreed to pay Seaport Marine its placement fee in installments taken directly from his paycheck while he was engaged at sea.

[21] At most, the only remedy that might conceivably be equitable in this circumstance would be to invalidate the PMA, while retaining the contractual validity of the Placement Contract. In that event, plaintiff might be entitled to the return of his $3,640 paid to Seaport Marine via the PMA's paycheck assignment mechanism; however, he would remain on the hook pursuant to the Placement Contract to pay Seaport Marine that full $3,640 placement fee via other means. To grant Smith relief on this basis would be a hollow, empty gesture, because the Court would essentially be taking $3,640 out of Seaport Marine's pocket and returning it to (Continued)

For these reasons, the Court declines plaintiff's request that it design an equitable general maritime remedy in Smith's favor. The PMA promulgated by Seaport Marine and signed by Smith did not violate 46 U.S.C. § 11109(b). To be sure, it contained a single word ("irrevocable") that was inconsistent with § 11109(b). But the record is devoid of evidence that Seaport Marine ever enforced that aspect of the PMA, that Smith ever challenged the revocability of the PMA, that Smith ever wanted to revoke the PMA, or that he was ever cognizant that the PMA included the "irrevocable" proviso. Moreover, any complained-of defect in the PMA would be limited to the assignment of wages provision, and would not invalidate Smith's underlying obligation to pay Seaport Marine the promised $3,640 in placement fees pursuant to the binding, valid Placement Contract. Under these circumstances, regardless of one's views on the 21st-century vitality of the "wards of admiralty" doctrine, the Court finds that it would be inequitable and inappropriate to create a brand-new judicial remedy that would grant Smith an unfair benefit at Seaport Marine's expense because of a technicality that made no difference in Smith's dealings with Seaport Marine and Odyssea Marine. Plaintiff having made no showing that he has been wronged or damaged, the Court will not wield its equitable authority under general maritime law to forge a never-before-recognized remedy granting him a windfall that would be fundamentally unfair and inequitable to defendants.

       *3.*      *Alternatively, Odyssea Owed No Duty to Serve as Smith's Legal Advisor.*

The foregoing discussion negates not only Smith's claim for seaman's wages against Seaport Marine, but also his corresponding claim against Odyssea Marine. If § 11109(b) was not violated, then plaintiff's general maritime claim predicated on violation of that section fails as to both defendants, not just Seaport Marine. Moreover, Smith's failure to make any inquiry or effort to revoke the PMA, and the dearth of evidence that he was misled or dissuaded from action by the inaccurate term "irrevocable" in that document, precludes him from opportunistically

---

Smith because of a technically deficient PMA, then ordering Smith to repay that same $3,640 to Seaport Marine pursuant to the valid, binding Placement Contract. The law does not require or endorse such futile acts, the net result of which would be to restore all parties to their present positions.

asserting now that the PMA should be invalidated and the agreed-upon placement fee reimbursed by Seaport Marine or Odyssea Marine.[22]

Notwithstanding the applicability of this rationale to both defendants, the Court writes separately to Smith's seaman's wage claim against Odyssea Marine to clarify one point. Plaintiff says that Odyssea Marine is liable under general maritime law because it should have either (i) "ignored" the PMA and simply distributed paychecks directly to Smith, in derogation of his contrary written directive; or (ii) "at a minimum, at the time of each and very [*sic*] payment of his wages, advis[ed] him that the PMA was legally non-binding <u>albeit</u> termed 'irrevocable', and obtain[ed] his acquiescence to forward his wages to Seaport." (Doc. 77, at 2; *see also* doc. 47, at 19, doc. 74, at 3.) Plaintiff does not suggest that the law required Odyssea to "ignore" his own written instructions; rather, plaintiff seeks to hold Odyssea Marine liable for not unilaterally furnishing him with legal advice about the enforceability of the PMA prior to each paycheck being forwarded to Seaport Marine. The law imposes no such burden on an employer.

---

[22]    From an equitable standpoint, plaintiff's claim against Odyssea Marine fares no better than his claim against Seaport Marine. Odyssea Marine paid out every penny of the wages earned by Smith during his employment. It did not hold back anything. To be sure, it forwarded his first six paychecks to Seaport Marine, but that was in accordance with Smith's written directive. Smith never expressed reservations or concerns to Odyssea Marine about this arrangement, much less asked Odyssea Marine to stop. Furthermore, the agreement in question was not prepared by Odyssea Marine, and Odyssea Marine was a stranger to it. Contrary to plaintiff's insistence, Odyssea Marine did not benefit from the wage assignment arrangement, with which it complied purely as an accommodation for the convenience of its employee and a third party. (Plaintiff's suggestion that Odyssea Marine derived a benefit from the PMA because of Seaport Marine's placement services is logically defective, inasmuch as there is no evidence that execution of the PMA was a necessary precondition to such placement services. Uncontroverted evidence shows that a seaman had multiple options for paying Seaport Marine its placement fee, of which a wage assignment was but one. There is thus no reason to believe that, but for the PMA, Seaport Marine would not have referred employees to Odyssea Marine, or that Odyssea Marine had any interest in, or anything to gain from, the enforcement or perpetuation of the PMA between its employees and Seaport Marine.) To grant plaintiff a remedy in the general maritime law against this defendant would be to require Odyssea Marine to double-pay certain wages to Smith, who would then receive the windfall of his full paycheck plus Odyssea Marine effectively footing the bill for Seaport Marine placement services that Smith had promised to pay. Such an inequitable outcome would not be an appropriate use of this Court's authority under the general maritime law.

Plaintiff does not identify an instance in which any court has ever required a ship owner unilaterally to provide legal counseling services to a seaman antecedent to honoring an assignment of wages contract between the seaman and a third party. The cited authorities on pages 19 and 20 of his principal brief (doc. 47) are readily distinguishable as arising in the release/settlement context and involving the employer's own contract, rather than a third-party agreement. *See, e.g., Lewis v. Texaco, Inc.*, 527 F.2d 921, 926 (2nd Cir. 1975) (plaintiff seamen had waived and released their rights to payment under a wages statute without being informed of those rights); *Sea-Land Service, Inc. v. Sellan*, 64 F. Supp.2d 1255, 1260 (S.D. Fla. 1999) (addressing "enforceability of a seaman's release and settlement agreement," not an assignment of wages); *Wink v. Rowan Drilling Co.*, 611 F.2d 98, 100 (5th Cir. 1980) ("The burden is upon the party claiming settlement as a defense to prove that it was entered into by the seaman with a full understanding of his rights."). In this case, Smith was not entering into a settlement agreement or release, nor was he waiving statutory rights under § 11109(b). What's more, neither Seaport Marine nor Odyssea Marine ever attempted to enforce the portion of the PMA about which Smith contends Odyssea Marine owed him a "paternalistic obligation" of legal advice concerning the "irrevocable" character of the PMA, versus the non-binding character of assignments pursuant to § 11109(b). The authorities Smith cites simply do not stand for the proposition that Odyssea Marine was required to give Smith advice that the PMA contained a singular term that conflicted with § 11109(b) and to verify that Smith did not wish to exercise his legal right of revocation under § 11109(b) before honoring the PMA into which Smith and Seaport Marine had entered. No case has applied the "paternalistic obligation" line of authority so expansively. "Given the centuries of admiralty cases – including numerous cases involving seamen's wage claims … the dearth of cases supporting [plaintiff]'s call for a newly minted fiduciary duty is telling." *Thorman v. American Seafoods Co.*, 421 F.3d 1090, 1098 (9th Cir. 2005) (citations omitted).[23]

---

[23] It is true enough that Smith does not use the vernacular of "fiduciary duty," but instead couches his argument in terms of "paternalistic obligations." It is also true, however, that the analogy between the two is quite close. *See, e.g., Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 247, 63 S.Ct. 246, 87 L.Ed. 239 (1942) ("The analogy suggested by Justice Story … between seamen's contracts and those of fiduciaries and beneficiaries remains, under the prevailing rule treating seamen as wards of admiralty, a close one.").

Conversely, at least one federal appellate court has condemned attempts to broaden a ship owner's obligations in an analogous context. In *Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116 (9th Cir. 2006), the plaintiff was a seaman whose employer notified him of state worker's compensation remedies but not potential federal claims and benefits if he were injured on the job. He argued that he was entitled to equitable relief when he realized (after the relevant limitations period had run) that he wished to pursue federal Jones Act and unseaworthiness claims against the ship owner; indeed, the plaintiff argued that the ship owner had a duty to advise him about those federal remedies. The appellate court rejected this argument, reasoning that the plaintiff "was not misled by anything defendants said, did not say, or did. He was simply unaware that seamen enjoy special protections under the law and his employer was under no obligation to advise him on that point." *Huseman*, 471 F.3d at 1124. When the plaintiff invoked the "wards of the court" doctrine, the *Huseman* court resisted, finding that this "special scrutiny typically reserved for release of rights in seaman's contracts cannot be extended to the circumstances here." *Id.* at 1125. The court elaborated that "the scope of these special protections is not unlimited" and that "we decline to impose a general, all-encompassing fiduciary duty on ship owners to inform seamen of all potential federal claims and benefits and the process for securing them when the employee fails to make even a threshold inquiry." *Id.* The Court finds *Huseman*'s reasoning persuasive and applicable to Smith's claims against Odyssea Marine.[24]

The Court's holding with respect to Smith's claims against Odyssea Marine is as follows: The paucity of record evidence that the PMA violated 46 U.S.C. § 11109(b); the absence of any indication that Smith ever objected to, inquired about, or was even aware of the "irrevocable" term in the PMA; and the equitable circumstances of Odyssea Marine having paid all wages owed to Smith in accordance with his unambiguous instructions (and for his own convenience)

---

[24] Also, there is at least some antique authority for the proposition that a seaman may not recover wages from his employer for an improper assignment absent evidence that he had attempted to revoke said assignment. *See Bibbins v. The Citizen*, 3 F. Cas. 331 (S.D.N.Y. 1847) (concluding that seaman had no claim against vessel owner to recover wages that he had assigned to a third party, "it not appearing to the court that the libellant has revoked or rescinded the said transfer, assignment, and power, or forbidden the said assignees and attorneys to act therein, or that the claimants have received any notice from him not to regard or observe the same on their part").

all, individually and collectively, foreclose plaintiff from recovering against Odyssea Marine on a claim for seaman's wages. The record is devoid of evidence that Smith was misled or otherwise injured, or that Odyssea Marine benefited from the PMA's "irrevocable" language. Under the circumstances, equitable maritime law principles do not allow Smith the windfall of doubling certain of his wages at Odyssea Marine's expense because of Odyssea Marine's transgression of honoring his contractual arrangement with a third party. Alternatively, the Court finds the reasoning of *Huseman* persuasive and declines to extend the "wards of admiralty" doctrine to impose on ship owners such as Odyssea Marine an affirmative obligation to scrutinize a seaman's wage assignment to which it a stranger, provide the seaman with unsolicited legal counsel about the enforceability of that agreement, and obtain confirmation in each pay period that the seaman in fact wished for the employer to pay his wages to the placement agency. Simply stated, Odyssea Marine had no legal or equitable duty to interject itself into a contract between Smith and a third party and impress upon him legal advice for which he never asked, much less tacit (or explicit) discouragement from doing that which he had agreed to do without objection or inquiry. Outside the release/settlement context (which is materially different and inapplicable here), no court appears ever to have imposed on a ship owner a duty analogous to plaintiff's insistence that Odyssea Marine should have "had Plaintiff affirm the directive of the PMA after advising him that it was legally non-binding each time before it forwarded his wages to Seaport" (doc. 74, at 3), despite Smith's failure ever to object, challenge or question the PMA to which he had voluntarily agreed. The undersigned will not be the first.

## V.    Conclusion.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact, and that defendants are entitled to judgment as a matter of law. Plaintiff's Motion for Summary Judgment (doc. 46) is **denied**, and defendants' Motions for Summary Judgment (docs. 48, 68) are **granted**. Plaintiff's claims against both defendants are **dismissed with prejudice**. A separate judgment will enter.


DONE and ORDERED this 4th day of November, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE